## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| S.W., by and through his<br>Parent, S.W., | : | |
| | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | No. 17-2188 |
| v. | : | |
| | | |
| ABINGTON SCHOOL | : | |
| DISTRICT, | | |
| | : | |
| Defendant. | : | |

**December  17, 2018**                                          **Anita B. Brody, J.**

### Memorandum[1]

Plaintiffs, S.W. ("S.W.") and his parent, S.W. ("Parent") (collectively, the "Family"),

bring this action against Defendant, Abington School District ("District"). The Family alleges

that the District failed to provide S.W. with a free appropriate public education ("FAPE") in

violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*,

and § 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794.  The Family seeks a compensatory

education for S.W. for the 2014-15 school year and the 2015-16 school year through January 5,

2016.

On September 27, 2016, the Family filed an administrative due process complaint against

the District, alleging that the District had denied a FAPE to S.W. during the 2014-15 and 2015-

16 school years.  In response, Special Education Due Process Hearing Officer William F.

Culleton, Jr., Esq. ("Hearing Officer") held a due process hearing.  On February 14, 2017, the

---

[1] Because of the many abbreviations referenced in this memorandum, a glossary of abbreviations is
attached as Appendix A.

Hearing Officer concluded that S.W. had not been denied a FAPE and declined to award a compensatory education to the Family. The Family now challenges that decision.

Before me are the parties' cross motions for judgment on the administrative record. I exercise jurisdiction to review the Hearing Officer's decision under 20 U.S.C. § 1415(i)(2). I affirm the Hearing Officer's conclusion that S.W. was not denied a FAPE. Accordingly, I will grant the District's motion, and deny the Family's motion.

## I. BACKGROUND

### A. Brief Overview of the IDEA and Section 504

"The IDEA protects the rights of disabled children by mandating that public educational institutions identify and effectively educate those children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009). The IDEA provides that all states receiving federal education funding must guarantee all children with disabilities a FAPE. 20 U.S.C. § 1412(a)(1). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 188–89 (1982). An Individualized Education Program ("IEP") is "the primary mechanism for delivering a FAPE." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012) (internal quotation marks omitted).

While the IDEA requires states receiving federal funding to provide a FAPE to all disabled children residing within the State, 20 U.S.C. § 1412(a)(1), section 504 of the RA prohibits discrimination on the basis of disability in federally funded programs, 29 U.S.C. § 794(a). The Third Circuit has "held that there are few differences, if any, between IDEA's

2

affirmative duty and § 504's negative prohibition and ha[s] noted that the regulations implementing § 504 require that school districts provide a free appropriate education to each qualified handicapped person in its jurisdiction."[2] *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999) (internal quotation marks omitted), *superseded by statute on other grounds as recognized by P.P.*, 585 F.3d 727 . "[C]ase law makes clear that a party may use the same conduct as the basis for claims under the IDEA and the RA." *Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 349 (3d Cir. 2007). "Therefore, when a state fails to provide a disabled child with a free and appropriate public education, it violates the IDEA. However, it also violates the RA because it is denying a disabled child a guaranteed education merely because of the child's disability."[3] *Id.* at 350.

---

[2]Although the IDEA and Rehabilitation Act overlap significantly, the Rehabilitation Act is broader in scope:

> [I]t is well recognized that Section 504 covers more students than does the IDEA. Students with disabilities who are eligible for services under IDEA are also covered by the prohibitions against discrimination on the basis of disability in Section 504 and its implementing regulation at 34 CFR Part 104, but students covered only by Section 504 are not entitled to the rights and protections enumerated by IDEA and its implementing regulations at 34 CFR Part 300.

*Molly L. ex rel. B.L. v. Lower Merion Sch. Dist.*, 194 F. Supp. 2d 422, 427 n.3 (E.D. Pa. 2002) (internal quotation marks omitted).

[3] A violation of the IDEA is not a per se violation of the RA. *Andrew,* 490 F.3d at 349-50. To prevail on a § 504 claim, a plaintiff must prove:

> (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. In addition, the plaintiff must demonstrate that defendants know or should be reasonably expected to know of his disability.

*Ridgewood*, 172 F.3d at 253 (citations omitted). Denial of a FAPE satisfies prong four because "[i]t is the denial of an education that is guaranteed to all children that forms the basis of the claim." *Andrew*, 490 F.3d at 350; *see also Centennial Sch. Dist. v. Phil L. ex rel. Matthew L.*, 799 F. Supp. 2d 473, 489 (E.D. Pa. 2011) ("Parents are correct in asserting that they can establish that [the student] was denied a benefit to which all other students were entitled simply on the basis that [the student] was disabled if they can establish a denial of a FAPE.").

"To the extent a school district fails to provide a student with a FAPE, a parent may file a due process complaint on behalf of his or her child, with a subsequent hearing held before an administrative hearing officer." *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 608 (3d Cir. 2015) (citing 20 U.S.C. §§ 1415(b)(6), (f)(1)(A)). "A party dissatisfied with the result of that hearing may then file an action in state or federal court." *Id.* (citing 20 U.S.C. § 1415(i)(2)).

### B. Factual Background[4]

S.W. is an eleven-year old boy who has been diagnosed with Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, and Disruptive Behavior Disorder. F.F. ¶ 5. S.W. has been eligible under the IDEA for special education based on his disability of Other Health Impairment. N.T. 9. S.W. attended school in the School District of Philadelphia ("SDP") for his kindergarten (2012-13) and first grade (2013-14) school years. On April 10, 2014, the SDP created an IEP for S.W. ("SDP IEP"). F.F. ¶ 2; S-2 at 1. The SDP IEP referred to the SDP's re-evaluation report of S.W. from May 6, 2013. F.F. ¶ 3. The present levels section of the SDP IEP provided most of the information from the May 6, 2013 re-evaluation report. F.F. ¶ 3.

The SDP IEP Special Considerations section indicated that S.W. exhibited behaviors that impeded his learning or that of others in the school setting. F.F. ¶ 6. Because S.W.'s behaviors impeded learning, the Special Considerations section instructed: "The IEP Team must complete

---

[4]     When a district court reviews a state agency's decision under the IDEA, "[f]actual findings from the administrative proceedings are to be considered prima facie correct." *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). A district court must defer to the state agency's credibility judgments and factual findings unless it can point "to contrary nontestimonial, extrinsic evidence on the record" that justifies a contrary conclusion. *Id.* Accordingly, the facts presented here are primarily based upon the Findings of Fact in the Hearing Officer's Decision. Any facts presented that are not based on the Hearing Officer's Findings of Facts come from the administrative record.

        "F.F." refers to the Findings of Fact in the Hearing Officer's decision. "H.O.D." refers to the Discussion and Conclusions of Law in the Hearing Officer's decision. Administrative record citations conform to the exhibits as entered during the Due Process Hearing. "S" denotes a School District Exhibit, and "P" denotes a Parent exhibit. "N.T." refers to the Notes of Testimony from the underlying due process hearing.

a Positive Behavior Support Plan that is based on a functional assessment of behavior and that utilizes positive behavior techniques." S-2 at 6. The SDP IEP Special Considerations section noted that S.W.'s behaviors included "difficulty maintaining attention to task, including lack of focus and attention, getting up out of Student's seat, noncompliance and escape behaviors. Student's behaviors were reported to include refusal, banging at table, crumpling paper, obsessive erasing, interrupting instruction, and physical aggression towards teachers and peers." F.F. ¶ 7. The SDP IEP included behavior goals and specially designed instruction specific to S.W.'s behavior needs. F.F. ¶¶ 24-26; S-2. The SDP IEP also recommended explicit instruction for reading in a special education classroom; a need for research-based reading and writing intervention program; and a need for social skills training. FF. ¶¶ 10-12; S-2.

While S.W. was a student in the SDP, the SDP conducted a Functional Behavior Assessment ("FBA") and developed a Positive Behavior Support Plan ("PBSP"). F.F. ¶ 15.

After the 2013-14 school year, S.W. transferred to Abington School District ("District").

### 1. First Grade

#### i. Adoption of the August 2014 IEP

On August 25, 2014, Parent and the District met for an IEP meeting. Parent provided the District with a copy of the SDP IEP. F.F. ¶ 2. The District did not have the SDP's May 6, 2013 re-evaluation report, FBA, or PBSP. F.F. ¶ 16. The District never received a copy of the May 6, 2013 re-evaluation report and the FBA, despite repeated requests to the SDP that it produce these documents.[5] N.T. 42, 50. Accordingly, the District proceeded without this information at the

---

[5] If the District had received the May 6, 2013 re-evaluation report, the District would have noticed that it referenced a psychiatric evaluation of S.W. conducted by Northwest Human Services on October 19, 2012. The District had Parent sign a record release for the psychiatric evaluation performed by Northwest Human Services but, the District did not receive the evaluation. *See* S-8; N.T. 671-72. Beyond the short description of the psychiatric evaluation in the May 6, 2013 re-evaluation report, it is impossible to discern what the psychiatric evaluation would have revealed about S.W.'s behavioral problems because

August 25, 2014 IEP meeting.

At the outset of the meeting, Parent made clear she would not accept an emotional support placement because she wanted S.W. to be with regularly developing children.  F.F. ¶ 17. The District agreed to provide S.W. with itinerant learning support, the same placement that had been provided to S.W. in the SDP IEP.  F.F. ¶ 19.  Parent and the District also agreed to have S.W. repeat first grade due to S.W.'s many absences during first grade in the SDP.  F.F. ¶ 18.

During the IEP meeting, the District and Parent agreed to implement the SDP IEP with certain revisions.  F.F. ¶ 20.  District personnel made the revisions to the SDP IEP by hand, striking or altering provisions, and then Parent initialed the changes.  F.F. ¶ 20; S-6.  At the IEP meeting, the District informed Parent that it did not recommend conducting a re-evaluation or FBA of S.W.  N.T. 167.

The August 2014 IEP did not alter the SDP IEP's acknowledgement that S.W. had behaviors interfering with learning.  F.F. ¶ 22.  Although the August 2014 IEP indicated that S.W. exhibited behaviors that impeded learning, the District did not commence its own FBA or PBSP.  F.F. ¶ 21.  The District decided to address S.W.'s behavior and social skills needs through goals and specially designed instruction, including by individualizing the first-grade classroom behavior system and by performing daily check-ins and check-outs with S.W. regarding his behavior.  F.F. ¶ 23.  The District agreed to implement the following goals from the SDP IEP:

- The goal to address S.W.'s refusal and oppositional behavior, as well as attentional needs, by encouraging compliance with school rules and classroom directives through positive reinforcement;

---

neither party included the psychiatric evaluation as an exhibit in the administrative record.

- The goal to address S.W.'s aggressive and disruptive behavior by shaping S.W.'s behavior to utilize language instead of acting out; and

- The goal to develop reading literacy skills, which included a benchmark for encoding.

F.F. ¶¶ 24, 25, 31; S-6. In the specially designed instruction section, the District agreed to use social stories and to make counseling available as interventions to address S.W.'s inappropriate behavior. F.F. ¶¶ 26-28. Additionally, the District agreed to implement specially designed instruction addressing S.W.'s reading and writing needs, attention needs, as well as accommodations in mathematics and other major subjects that were necessary because of S.W.'s delayed reading achievement. F.F. ¶¶ 32-35. Parent accepted the August 2014 IEP offered by the District. F.F. ¶ 37.

## ii. Implementation of the August 2014 IEP

At the beginning of the 2014-15 school year, the District assigned S.W. to a special education teacher who has a master's degree in special education and extensive experience. F.F. ¶ 29. The District also assigned S.W. to a regular education classroom teacher who has a master's degree in education, extensive experience, and certifications in both regular and special education. F.F. ¶ 30. S.W.'s special education teacher consulted with his classroom teacher to individualize the classroom behavior management plan for S.W. F.F. ¶ 38. S.W.'s teachers addressed S.W.'s behaviors through a class-wide positive behavior management system that was individualized by trial and error selection of motivators or rewards and reward tracking instruments. F.F. ¶ 39. The teachers changed motivators and tracking instruments repeatedly to try to find the most effective motivators for S.W. F.F. ¶ 39. District personnel used daily check-ins and check-outs with S.W. at the beginning and end of the day to help S.W. become self-aware of his behavior and its impact. F.F. ¶ 41. S.W.'s special education and regular education

teachers used social stories to address S.W.'s social skills needs.  F.F. ¶ 44.  S.W.'s special

education teacher also addressed social skills needs through the regular education curriculum, as

well as through specially designed instruction, including visual reminders and counseling during

check-ins and check-outs.  F.F. ¶ 45.  Additionally, S.W. attended a special education classroom

for one period of the day to receive explicit teaching of reading.  F.F. ¶ 47.

S.W.'s classroom teacher kept data on S.W.'s goal for replacing aggression with words.

F.F. ¶ 43.  S.W.'s special education teacher kept data on S.W.'s starting and finishing work to

measure S.W.'s attention difficulties.  F.F. ¶ 46.  The special education teacher also compiled

data by interviewing teachers at the end of each day, and specifically inquiring about problem

behaviors exhibited during the day.  F.F. ¶ 46.  The classroom teacher and special education

teacher also kept records of S.W.'s compliance with directions based on teacher reports of

incidents.  F.F. ¶ 42.  Teachers did not record the number of prompts needed to obtain S.W.'s

compliance in every instance and did not collect daily data for all periods of the day.  F.F. ¶ 42.

### iii. The March 2015 IEP

In March 2015, the District convened S.W.s' annual IEP meeting and revised his IEP.

The March 2015 IEP provided measurable goals for writing fluency; following classroom rules

and directions; initiation and completion of assignments; keeping hands to self; and using kind,

appropriate language toward others.  F.F. ¶ 48.  The District amended the Special Consideration

section of the March 2015 IEP to indicate that S.W. did not exhibit behaviors that impeded

learning.  S-17.  The March 2015 IEP no longer had a reading goal because S.W. had mastered

the goal and was reading at grade level.  F.F. ¶ 48.  The March 2015 IEP also did not offer

explicit social skills instruction, but specially designed instruction regarding teacher discussions

of S.W.'s behavior addressed behaviors involving social interaction.  F.F. ¶ 55.  T

The behavior goals in the March 2015 IEP were modified based on updated information about S.W.'s progress. F.F. ¶ 48. The goal for compliance with teacher directives was designed to be measured by the number of instances in which more than two prompts were required to obtain S.W.'s compliance. F.F. ¶ 49. The special education teacher continued to collect data on instances in which S.W. needed more than two prompts. F.F. ¶ 49.

Additionally, the March 2015 IEP continued many of the practices from the August 2014 IEP, including the daily check-in and check-out procedure, the positive behavior system, as well as modifications addressing S.W.'s attention and writing needs. F.F. ¶ 51. The March 2015 IEP continued S.W.'s placement in itinerant learning support and reduced his time in the special education classroom to 45 minutes per week designated for S.W. to work on writing fluency. F.F. ¶ 53. For the remainder of first grade, District personnel implemented the March 2015 IEP.

### iv. S.W.'s Progress in First Grade

During S.W.'s first grade year, District personnel did not believe that an FBA was necessary. F.F. ¶ 40. They felt capable of identifying and addressing S.W.'s behaviors of concern through IEP goals and specially designed instruction, as well as through the class-wide behavior system that was individualized for S.W. F.F. ¶ 40. In first grade, S.W. did not miss a significant amount of time due to removal from the classroom. F.F. ¶ 58. Moreover, inappropriate behaviors did not interfere with S.W.'s ability to access the curriculum in his regular education classroom. F.F. ¶ 58. While S.W.'s behaviors continued as the year progressed, they decreased in frequency and S.W. experienced a decreasing rate of disciplinary write-ups for serious behavioral incidents. F.F. ¶¶ 56-57. S.W. progressed at using skills he learned in first grade to reduce inappropriate behaviors. F.F. ¶ 57. Additionally, S.W. made academic progress in reading, mathematics and writing, although S.W.'s progress in writing was

weaker.  F.F. ¶ 59.

## 2. Second Grade

### i. Continued Implementation of the March 2015 IEP

In second grade, the District assigned S.W. to an experienced regular education teacher who had already developed a trusting relationship with S.W. while S.W. was in first grade.  The teacher also provided a relatively structured classroom that would help manage S.W.'s attention needs and behaviors.  F.F. ¶ 60.  Both the classroom teacher and special education teacher continued to implement the March 2015 IEP.  F.F. ¶ 64.  The classroom teacher, in consultation with the special education teacher, continued to employ a class-wide behavior management system that was individualized to S.W.  F.F. ¶ 64.  Additionally, S.W. participated in a formal social skills instructional program provided by the District.

Both the classroom teacher and the special education teacher used a record-keeping system that measured S.W.'s ability to follow directions, use kind words and report conflict to the teacher, and avoid physical aggression toward others.  F.F. ¶ 65.  The system recorded time periods during the school day in which S.W. was unable, or needed more than two prompts, to engage in appropriate behavior.  F.F. ¶ 65.  The special education teacher continued to obtain data about S.W.'s behavior by interviewing the classroom teacher daily.  The classroom teacher received reports from the aides responsible for lunch and other unstructured areas, and from specials teachers.  These reports were often given orally at the end of the day.  F.F. ¶ 66.

In October and November of 2015, S.W.'s inappropriate behaviors and behavioral incidents increased.  F.F. ¶¶ 67, 71.  The majority of S.W.'s increased inappropriate behaviors occurred in less structured areas of school, such as hallways, lunch areas and recess areas, as well as in specials classes.  F.F. ¶ 68.  While S.W. exhibited some inappropriate behaviors in the

classroom, his regular education teacher was able to maintain S.W.'s participation in the classroom through prompting, close proximity, and the implementation of the specially designed instructions in S.W.'s March 2015 IEP.  F.F. ¶ 68.  During this period, S.W. maintained satisfactory grade-level academic progress.  F.F. ¶ 69.

### ii. The November 2015 IEP

In November 2015, the District convened an IEP meeting to address S.W.'s increased behavioral incidents.  F.F. ¶ 71.  At the meeting, the District amended S.W.'s IEP to add information and data concerning S.W.'s increased behaviors and to reflect changes in positive reinforcement strategies.  F.F. ¶ 72.  The District, however, did not amend S.W.'s IEP to state that S.W.'s behaviors impeded learning.  F.F. ¶ 74.

During the IEP meeting, the District offered to conduct a re-evaluation of S.W., but Parent withheld consent pending consultation with her lawyer.  F.F. ¶ 75.

While waiting for Parent to consent to a re-evaluation, S.W.'s teachers increased their observation of S.W.'s behavior in less structured settings, counseled staff in these settings as to the appropriate response to inappropriate behavior, and assigned instructional assistants to attend to S.W. in specials classes.  Teachers and the principal also introduced new positive behavior motivators in the form of time for S.W. to spend with preferred staff.  F.F. ¶ 77.  Teachers also revised their data gathering process and form to better record data from specials classes and unstructured areas.  F.F. ¶ 79-80.

### iii. The March 2016 IEP

On March 17, 2016, Parent informed the District that she had decided to consent to a re-evaluation of S.W.  On March 22, 2016, the District conducted S.W.'s annual IEP meeting and Parent signed the form consenting to the re-evaluation.  F.F. ¶ 85.  In the March 2016 IEP, the

District reinstated a reading goal and retained one behavior goal for following directions and completing assignments. F.F. ¶ 87-88. The District did not amend the March 2016 IEP to state that S.W.'s behaviors impeded learning. P-13.

### iv. The May 2016 Re-Evaluation

In May 2016, the District's school psychologist performed a re-evaluation of S.W. that included an FBA. F.F. ¶ 92-93. The FBA concluded that S.W.'s off-task and aggressive behaviors were being maintained by impulsive, task-avoidant and attention seeking functions. F.F. ¶ 93. The evaluation concluded that S.W.'s inappropriate behaviors were affecting S.W.'s educational progress. The evaluation also concluded that S.W.'s academic performance was proficient to advanced in all areas. F.F. ¶ 94. The evaluation indicated that S.W. had educational needs in written expression; reading comprehension; following directions; initiating and completing tasks; attention to task and off-task passive behaviors; and aggressive behavior including unkind words and unsafe hands. F.F. ¶ 96.

### v. The June 2016 IEP

On June 10, 2016, the District and Parent met for an IEP meeting and revised S.W.'s IEP. F.F. ¶ 99. The June 2016 IEP provided measurable goals addressing reading comprehension; initiating and completing assignments; and oral reading fluency. F.F. ¶ 101. The June 2016 IEP retained student's placement in itinerant learning support with instruction in the special education classroom twice per week for 45 minutes for communications arts and once per week for 30 minutes for social skills. F.F. ¶ 100. Additionally, the June 2016 IEP included specially designed instruction, modifications, and accommodations addressing S.W.'s needs regarding behaviors; attention to task; organization; task initiation and completion; testing accommodations; hyperactivity; reading; written expression; and social skills. For the first time,

the District's IEP for S.W. indicated that S.W.'s behaviors impeded learning and the IEP incorporated a PBSP. P-15. The PBSP included additional measurable behavior goals addressing time on task; compliance with teacher directions; using kind, respectful language toward others; and not invading peers' personal space. The PBSP provided for incentives through a classroom behavior system. F.F. ¶ 103.

### vi. S.W.'s Progress in Second Grade

In second grade, S.W. experienced fewer disciplinary write-ups than in first grade. F.F. ¶ 81. Although S.W.'s behaviors outside the classroom were problematic, inside the classroom the teacher managed S.W.'s behaviors in such a way to permit S.W. to make academic, developmental, and social progress. F.F. ¶ 83. Overall, S.W. made significant progress academically and functioned at grade level in core academic areas, despite below average performance in reading and sentence composition. F.F. ¶ 104. S.W. also made significant progress in behavior, despite continued difficulties that decreased over time. F.F. ¶ 105.

## II. LEGAL STANDARD

"When considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as 'modified de novo' review." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010). Under this standard, the district court must give "due weight" to the findings of the administrative hearing officer. *Id.* "Factual findings from the administrative proceedings are to be considered prima facie correct. If a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities." *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (citation omitted) (internal quotation marks omitted).

"[C]laims for compensatory education and tuition reimbursement are subject to plenary review as conclusions of law. . . . [W]hether the District fulfilled its FAPE obligations—[is] subject to clear error review as [a] question[] of fact." *P.P.*, 585 F.3d at 735. Additionally, "[t]he issue of whether an IEP is appropriate is a question of fact." *S.H.*, 336 F.3d at 271. "Within the confines of these standards, a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate . . . ." *D.S.*, 602 F.3d at 564. A district court is to respect the credibility determination of the witnesses made by the administrative hearing officer unless "nontestimonial evidence" requires a contrary conclusion. *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 200-01 (3d Cir. 2004). "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley*, 680 F.3d at 270.

## III. DISCUSSION

The Family contends that the District denied S.W. a FAPE during his first and second grade school years because the District failed to provide appropriate behavioral support to S.W. in his IEPs. "The IEP is 'the centerpiece of the [IDEA's] education delivery system for disabled children.'" *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988 at 994 (2017) (quoting *Honig v. Doe*, 484 U.S. 305, 311, 108 S. Ct. 592, 98 L.Ed.2d 686 (1988)). Once a child is identified as having a disability under the IDEA, "school districts must work with parents to design an IEP, which is a program of individualized instruction for each special education student." *Ridley*, 680 F.3d at 269 (citing 20 U.S.C. §§ 1412(a)(4), 1414(d)). "An IEP consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services." *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 589 (3d Cir. 2000)

(citing 20 U.S.C. § 1401(a)(20)).  "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child."  *Endrew*, 137 S. Ct. at 994 (quoting *Rowley*, 458 U.S. at 181).

There are two types of challenges a parent may raise to the adequacy of an IEP: (1) a school district's failure to comply with the procedural requirements of the IDEA; and (2) a school district's failure to comply with the substantive requirements of the IDEA.  *D.S.*, 602 F.3d at 564.  A procedural violation of the IDEA results in a denial of a FAPE "only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits."  *Id.* at 565 (citing *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 at 525-26 (2007)).  "Thus, though it is important that a school district comply with the IDEA's procedural requirements, rather than being a goal in itself, such compliance primarily is significant because of the requirements' impact on students' and parents' substantive rights."  *Id.*

 While certain deficiencies in an IEP may initially appear to raise both a procedural and substantive challenge to the adequacy of an IEP, the Third Circuit has clarified that challenges to "[t]he content of an IEP as such does not implicate the IDEA's procedural requirements for content is concerned with the IEP's substance."  *D.S.*, 602 F.3d at 565.

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew*, 137 S. Ct. at 999.   This standard "mirrors" the Third Circuit's "longstanding formulation: the educational program 'must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities.'"  *K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248,

254 (3d Cir. 2018) (quoting *Ridley*, 680 F.3d at 269). As the Supreme Court has emphasized, "[t]he 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials. . . . Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew*, 137 S. Ct. 999.

The goal of an IEP is to enable a child to make progress. *Id.* "Progress through this system is what our society generally means by an 'education.' And access to an 'education' is what the IDEA promises. Accordingly, for a child fully integrated in the regular classroom, an IEP typically should . . . be 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" *Id.* (citation omitted) (quoting *Rowley*, 458 U.S. at 203-04.)

The Family contends that each of the District's IEPs for S.W. that did not contain a PBSP failed to provide appropriate behavioral support to S.W. and denied S.W. a FAPE. However, the family only seeks a compensatory education for S.W. for the 2014-15 school year and the 2015-16 school year through January 5, 2015. The Family only seeks compensatory education through January 5, 2015 of S.W.'s second grade school year because it concedes that when the District sought to re-evaluate S.W. on November 6, 2015, the Parent delayed providing consent until March 22, 2016. Although the District sought permission to re-evaluate on November 6, 2015, the Family contends that S.W. is entitled to compensatory education through January 5, 2015 because even if Parent had immediately consented to the re-evaluation, the District still could have taken as long as sixty days to re-evaluate S.W. Because the Family only seeks a compensatory education for S.W. for the 2014-15 school year and the 2015-16 school year through January 5, 2015, the relevant inquiry is whether the IEPs in place during this period, the August 2014 IEP, the March 2015 IEP, and the November 2015 IEP, failed to provide

appropriate behavioral support to S.W.

**A. Whether the District Denied S.W. a FAPE in the Adoption and Implementation of the August 2014 IEP**

In the August 2014 IEP, the District implemented S.W.'s previous SDP IEP with revisions. Despite some changes, the August 2014 IEP did not alter the Special Considerations section of the SDP IEP that acknowledged S.W.'s behaviors interfered with learning.

Before the Hearing Officer, the Family had argued that the District violated the IDEA when it noted in the August 2014 IEP that S.W. exhibited behaviors that impeded learning, but failed to conduct an FBA and implement a PBSP. The Hearing Officer concluded that the District was not obligated to conduct an FBA and implement a PBSP because only the SDP had determined that S.W. displayed behaviors that interfered with learning. In the Hearing Officer's opinion, "at most the District committed an error as it revised the previous district's IEP, by failing to cross out the previous district's Special considerations findings regarding behavior." H.O.D. 18. After examining the behavioral support provided in the August 2014 IEP, and taking into consideration S.W.'s academic progress in the first grade, the Hearing Officer concluded that based on what the District knew at the August 2014 IEP meeting, the August 2014 IEP was reasonably calculated to enable S.W. to receive meaningful educational benefits and therefore provided a FAPE to S.W.

The Family now contends that the Hearing Officer factually erred in concluding that the District did not intend to check the box that S.W.'s behaviors impeded learning and legally erred in concluding that the District was not required to conduct an FBA and implement a PBSP.

Although the language of the IDEA only requires a school district to "consider the use" of a PBSP for "a child whose behavior impedes the child's learning or that of others," 20 U.S.C. § 1414(d)(3)(B)(i), Chapter 14 of the Pennsylvania regulations implementing the IDEA requires

a school district to conduct an FBA and implement a PBSP for a "child[] who require[s] specific intervention to address behavior that interferes with learning," 22 Pa. Code § 14.133. Because the IDEA "incorporates state standards, . . . a school district may violate the IDEA if it fails to satisfy the more stringent state law requirements." *Michael C. ex rel. Stephen C. v. Radnor Twp. Sch. Dist.*, 202 F.3d 642, 652 (3d Cir. 2000) (internal quotation marks omitted); *see also Geis v. Bd. of Educ. of Parsippany-Troy Hills, Morris Cty.*, 774 F.2d 575, 581 (3d Cir. 1985). The Family argues that the District failed to comply with state regulation and thus violated the IDEA when it indicated on the August 2014 IEP that S.W.'s behaviors impeded learning, but failed to conduct an FBA and implement a PBSP for S.W.

In *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165 (2d Cir. 2009), the Second Circuit confronted a similar challenge by parents to an IEP. There, the parents argued that the school district's failure to conduct an FBA in accordance with New York state law was a procedural violation of the IDEA that denied the student a FAPE. *A.C.*, 553 F.3d at 172. The Second Circuit did not need to reach a decision as to whether the school district had procedurally violated the FBA because it held that even "[a]ssuming such a violation may have occurred, the violation of such a regulation d[id] not compel the conclusion that the . . . IEP was legally inadequate." *Id.* Regardless of any failure to conduct an FBA, the Second Circuit held that the school district had not denied the student a FAPE because the IEP had provided strategies to address the student's behavior needs. *Id.*

Similarly, in this case there is no need to reach whether the Hearing Officer erred in concluding that the District was not required to conduct an FBA and implement a PBSP because even assuming this was a requirement, the District's failure to do so did not amount to a denial of a FAPE. While the Second Circuit categorized the failure to conduct an FBA as a procedural

violation, in the Third Circuit the failure to conduct an FBA and implement a PBSP is a potential substantive violation because the Family's complaint is that the IEP failed to provide behavioral support, i.e. that the content of the IEP was lacking.[6]  As the Third Circuit has firmly stated, "[t]he content of an IEP as such does not implicate the IDEA's procedural requirements for content is concerned with the IEP's substance." *D.S.*, 602 F.3d at 565.  Thus, the District's decision in the August 2014 IEP not to conduct an FBA and implement a PBSP will only violate the IDEA if the IEP was not "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew*, 137 S. Ct. at 999.

After examining the behavioral support provided in the August 2014 IEP, the Hearing Officer concluded that based on what the District knew at the August 2014 IEP meeting, the August 2014 IEP was reasonably calculated to enable S.W. to receive meaningful educational benefits and therefore provided a FAPE to S.W.  The Family argues that the Hearing Officer legally erred in applying the standard that the IEP was appropriate "based on what the District knew at the time."  But, the Supreme Court has cautioned that "an appropriate program of education requires a prospective judgment by school officials." *Id.*  Thus, an IEP cannot be judged in hindsight, but must be based on what the District knew at the time the IEP was created. Accordingly, the Hearing Officer did not apply an incorrect legal standard.[7]

---

[6] Even if this could be categorized as a procedural violation, the conclusion would still be the same that S.W. was not denied a FAPE.  A procedural violation results in a denial of a FAPE "only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." *D.S.*, 602 F.3d at 565.  "Thus, though it is important that a school district comply with the IDEA's procedural requirements, rather than being a goal in itself, such compliance primarily is significant because of the requirements' impact on students' and parents' substantive rights." *Id.*  As discussed below, the failure to conduct an FBA and implement a PBSP did not impact the Family's substantive rights.

[7]　　　Despite objecting to the Hearing Officer's "legal error," the crux of the Family's argument is that the Hearing Officer factually erred when he concluded that the IEP was appropriate based on what the District knew at the time.  The Family contends that IEP was not appropriate because the District should have known more at the time it created the August 2014 IEP.

Based on what the District knew at the time, the August 2014 IEP was reasonably calculated to provide meaningful educational benefits to S.W. The SDP IEP disclosed that S.W. had been diagnosed with behavioral and attention difficulties, including hyperactivity and oppositional behavior. It also indicated that S.W. needed specially designed instruction to address his inappropriate and sometimes aggressive behaviors, and to address his social skills. Additionally, the SDP IEP disclosed that S.W. needed explicit instruction in reading and writing skills. Based on the information the District obtained from the SDP IEP and from Parent, the District decided in S.W.'s August 2014 IEP to implement the SDP IEP with certain revisions.

The August 2014 IEP placed S.W. in itinerant learning support as requested by Parent, with S.W. to attend one period of the day in a special education classroom to receive reading instruction. The goals of the August 2014 IEP were:

- To address S.W.'s refusal and oppositional behavior, as well as attentional needs, by encouraging compliance with school rules and classroom directives through positive reinforcement;

---

At the time the District created the IEP, it was aware that the SDP had conducted an FBA and a PBSP, as well as a May 6, 2013 re-evaluation report. Additionally, in 2012, a psychiatric evaluation of S.W. had been conducted by Northwest Human Services. But, when the District implemented the August 2014 IEP, none of this information was available.

In essence, the Family argues that the District procedurally violated the IDEA when it failed to follow the regulation requiring it to "take reasonable steps to promptly obtain [S.W.'s] records . . . from the previous public agency in which [S.W.] was enrolled." 34 C.F.R. § 300.323(g). The record, however, demonstrates that the District repeatedly requested copies of the FBA and the May 6, 2013 re-evaluation report from the SDP, but did not receive them. Thus, the district took reasonable steps to obtain S.W.'s records.

The record is unclear as to the steps the District took to obtain the psychiatric evaluation from the SDP. Even if it could be established that the District did not take reasonable steps to obtain the evaluation, the Family still could not demonstrate that this procedural violation resulted in a denial of a FAPE. A procedural violation results in a denial of a FAPE "only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." *D.S.*, 602 F.3d at 565. Because the psychiatric evaluation is not part of the administrative record, it is impossible to discern what it would have relayed about S.W.'s behavioral problems, and whether it would have, or should have, impacted the District's August 2014 IEP.

- To address S.W.'s aggressive and disruptive behavior by shaping S.W.'s behavior to utilize language instead of acting out; and

- To develop reading literacy skills, which included a benchmark for encoding.

In the specially designed instruction section, the District agreed to use social stories and to make counseling available as interventions to address S.W.'s inappropriate behavior. Additionally, the District agreed to implement specially designed instruction addressing S.W.'s reading and writing needs, attention needs, as well as accommodations in mathematics and other major subjects that were necessary because of S.W.'s delayed reading achievement.

To implement the August 2014 IEP, the District assigned S.W. to a special education teacher and classroom teacher who have master's degrees and extensive experience in special education. S.W.'s special education teacher consulted with his classroom teacher to individualize the classroom behavior management plan for S.W. The teachers addressed S.W.'s behaviors through a class-wide positive behavior management system that was individualized by trial and error selection of motivators or rewards and reward tracking instruments. The teachers changed motivators and tracking instruments repeatedly to try to find the most effective motivators for S.W. District personnel used daily check-ins and check-outs with S.W. at the beginning and end of the day to help S.W. become self-aware of his behavior and its impact. S.W.'s special education and regular education teachers used social stories to address S.W.'s social skills needs. S.W.'s special education teacher also addressed social skills needs through the regular education curriculum, as well as through specially designed instruction, including visual reminders and counseling during check-ins and check-outs.

S.W.'s classroom teacher kept data on S.W.'s goal for replacing aggression with words. S.W.'s special education teacher kept data on S.W.'s starting and finishing work to measure

S.W.'s attention difficulties. The special education teacher also compiled data by interviewing teachers at the end of each day, and specifically inquiring about problem behaviors exhibited during the day. The classroom teacher and special education teacher also kept records of S.W.'s compliance with directions, based on teacher reports of incidents.

The record demonstrates that even though the District did not conduct an FBA and implement a PBSP, it appropriately provided and implemented strategies to address S.W.'s behavior needs, as well as his academic needs. While the District's record keeping system was not perfect—for instance, Teachers did not always record the number of prompts needed to obtain S.W.'s compliance—these imperfections did not prevent S.W. from receiving meaningful educational benefits.

As the Supreme Court has explained, the goal of an IEP is to enable a child to make progress. *Endrew*, 137 S. Ct. 999. "Progress through this system is what our society generally means by an 'education.' And access to an 'education' is what the IDEA promises. Accordingly, for a child fully integrated in the regular classroom, an IEP typically should . . . be 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" *Id.* (citation omitted) (quoting *Rowley*, 458 U.S. at 203-04.).

During first grade, S.W. was almost fully integrated into the regular classroom. The record demonstrates that S.W.'s IEP was reasonably calculated to enable him to achieve passing marks and advance to the next grade, goals he readily accomplished. The IEP provided meaningful academic benefit to S.W. and he received good grades, reflecting achievement at either the proficient or the advanced level in core subjects. Moreover, S.W. made rapid progress in reading, so much so that by March 2015 he had mastered his IEP goal for reading. Additionally, S.W. received meaningful benefit regarding behavior and social skills. As the

Hearing Officer concluded, both teachers and the principal credibly testified that S.W. made progress with his off-task, escape-motivated and aggressive behaviors.

The record demonstrates that the District's August 2014 IEP was reasonably calculated to enable S.W. to make progress appropriate in light of his circumstances, and therefore he was not denied a FAPE.

### B. Whether the District Denied S.W. a FAPE in the Adoption and Implementation of the March 2015 IEP and the November 2015 IEP

The Family contends that the March 2015 IEP and the November 2015 IEP were inappropriate because they failed to acknowledge that S.W. exhibited behaviors that impeded learning, and consequently the District failed to conduct an FBA and implement a PBSP in these IEPs. Additionally, the Family contends that even if the IEPs were appropriate, the District failed to properly implement their behavioral goals.

The Family argues that S.W. exhibited behaviors that impeded learning throughout first and second grade and that these behaviors should have been acknowledged in the IEPs. In the Findings of Fact, however, the Hearing Officer found that throughout first grade, "inappropriate behaviors did not interfere with [S.W's] ability to be present in the regular education classroom as substantially necessary to access the curriculum." F.F. ¶ 58. Additionally, the Hearing Officer found that although S.W.'s inappropriate behaviors "increased . . . in less structured areas of school . . . , [S.W.'s] regular education teacher was able to maintain student's participation in the curriculum." F.F. ¶ 68. Based on these findings, the Hearing Officer concluded that District appropriately did not indicate that S.W.'s behaviors impeded learning in the March 2015 IEP and the November 2016 IEP. These findings of fact are prima facie correct, and the Family has not presented sufficient record evidence to contradict them. The evidence supports the Hearing Officer's conclusion that the March 2015 IEP and the November 2016 IEP were appropriate, and

the District was not obligated to indicate that S.W.'s behaviors impeded learning in each of these IEPs.

In the March 2015 IEP, S.W.'s goals were updated based on his progress and then-current needs. The March 2015 IEP provided measurable goals for writing fluency; following classroom rules and directions; initiation and completion of assignments; keeping hands to self; and using kind, appropriate language toward others. Additionally, the March 2015 IEP no longer had a reading goal because S.W. had mastered the goal and was reading at grade level. The March 2015 IEP continued S.W.'s placement in itinerant learning support and reduced his time in the special education classroom to 45 minutes per week to work on the writing fluency goal. The March 2015 IEP also did not offer explicit social skills instruction, but specially designed instruction regarding teacher discussions of S.W.'s behavior addressed behaviors involving social interaction. The teachers continued to collect data on S.W.'s progress.

During S.W.'s first grade year, District personnel did not believe that an FBA was necessary. They felt capable of identifying and addressing S.W.'s behaviors of concern through IEP goals and specially designed instruction, as well as through the class-wide behavior system that was individualized for S.W. As the year progressed, S.W.'s behaviors continued, but they decreased in frequency, and S.W. experienced a decreasing rate of disciplinary write-ups for serious behavioral incidents. Thus, S.W. made progress in using skills taught in first grade aimed at reducing inappropriate behaviors. Additionally, in first grade, S.W. made academic progress in reading, mathematics and writing, although S.W.'s progress in writing was weaker. The record demonstrates that the District's March 2015 IEP was reasonably calculated to enable S.W. to make progress appropriate in light of his circumstances, and therefore he was not denied a FAPE.

In second grade, the District continued to implement the March 2015 IEP. S.W. was assigned to an experienced regular education teacher who had already developed a trusting relationship with S.W. while S.W. was in first grade. The teacher also provided a relatively structured classroom that would help manage S.W.'s attention needs and behaviors. The classroom teacher, in consultation with the special education teacher, continued to employ a class-wide behavior management system that was individualized to S.W. Additionally, S.W. participated in a formal social skills instructional program provided by the District. The regular education and special education teachers continued to collect data on S.W.'s progress.

In November 2015, the District convened an IEP meeting due to increased behavioral incidents.[8] At the meeting, the District amended the IEP to add information and data concerning S.W.'s increased behaviors and to reflect changes in positive reinforcement strategies. At the IEP meeting, the District offered to conduct a re-evaluation of S.W., but Parent withheld consent pending consultation with her lawyer. While waiting for Parent to consent to a re-evaluation, S.W.'s teachers increased their observation of S.W.'s behavior in less structured settings, counseled staff in these settings as to the appropriate response to inappropriate behavior, and

---

[8] The Family argues that the Hearing Officer erred in the following Findings of Fact:
- "In October and November of [S.W.'s] second grade year, there was an increase in the rate of referrals for serious disciplinary infractions and in Student's non-disciplinary inappropriate behavior." F.F. ¶ 67.
- "In November 2015, the District convened an IEP meeting due to increase behavioral incidents." F.F. ¶ 71.

The Family contends that S.W.'s behavioral problems did not increase at the beginning of second grade and this demonstrates that the District delayed addressing S.W.'s behavioral problems that it knew about throughout first grade. The Family is correct that the record of serious disciplinary infractions, exhibit P-8, demonstrates that only one serious disciplinary infraction occurred prior to the November 2015 IEP meeting. The Hearing Officer incorrectly found that there was an increase in the rate of referrals for serious disciplinary infractions in October and November of second grade. But, the record demonstrates that the Hearing Officer correctly found that S.W.'s inappropriate behaviors increased in October and November of second grade and the District convened the November 2015 IEP meeting to address these increased behavioral incidents. The facts, as corrected, do not lead to the conclusion that the District should have sought to re-evaluate S.W. much sooner.

assigned instructional assistants to attend to S.W. in specials classes. Teachers and the principal also introduced new positive behavior motivators in the form of time for S.W. to spend with preferred staff. F.F. ¶ 77. Teachers also revised their data gathering process and form to better record data from specials classes and unstructured areas.

Although S.W.'s behaviors outside the classroom were problematic in second grade, inside the classroom the teacher managed S.W.'s behaviors in such a way to permit S.W. to make academic, developmental, and social progress. S.W. made significant progress in behavior, despite continued difficulties that decreased over time. Overall, S.W. also made significant progress academically and functioned at grade level in core academic areas, despite below average performance in reading and sentence composition. Although S.W.'s November 2015 IEP may not have been ideal, even with the increased inappropriate behaviors during the first half of second grade, S.W. maintained satisfactory grade-level academic performance. The record demonstrates that the District's November 2015 IEP was reasonably calculated to enable S.W. to make progress appropriate in light of his circumstances, and therefore he was not denied a FAPE.

Because the District did not deny S.W. a FAPE, the District did not violate the IDEA.[9] Accordingly, S.W. is not entitled to compensatory education for the 2014-15 school year and the 2015-16 school year through January 5, 2016.

## IV. CONCLUSION

For the reasons set forth above, I will grant the District's motion for judgment on the

---

[9] The Family also contends that the District violated § 504 of the Rehabilitation Act. The Family premises the § 504 claim on its contention that S.W. was denied a FAPE during the first and second grade school years. Because the District did not deny S.W. a FAPE, the Family cannot succeed on the § 504 claim. *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253 n.8 (3d Cir. 2012) ("[O]ur finding that the School District did not deny [student] a FAPE is equally dispositive of Plaintiffs' § 504 claim.").

administrative record, and I will deny the Family's motion for judgment on the administrative record.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on  12/17/2018

**Appendix A**

**Glossary of Abbreviations**

- FAPE – Free Appropriate Public Education

- FBA – Functional Behavior Assessment

- IDEA – Individuals with Disabilities Education Act

- IEP – Individualized Education Program

- PBSP – Positive Behavior Support Plan

- RA – Rehabilitation Act

- SDP – School District of Philadelphia